**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED ) | |
| TRADES INDUSTRY PENSION FUND, as ) | |
|     and for its Board of Trustees and the ) | CIVIL ACTION NO. |
|     International Painters and Allied Trades ) | |
|     Industry Pension Plan; ) | |
| TIM D. MAITLAND, in his official capacity ) | |
|     as a fiduciary ) | |
| 7234 Parkway Drive ) | |
| Hanover, MD 21076 ) | |
|  ) | |
|                    Plaintiffs ) | |
|  ) | |
|        v. ) | |
|  ) | |
| HUSSMAN CORPORATION, ) | |
| a Missouri corporation ) | |
| 12999 St. Charles Rock Road ) | |
| Bridgeton, MO 63044 ) | |
|  ) | |
| FCC, LLC ) | |
|     d/b/a First Capital Corporation ) | |
|     a dissolved Florida limited liability company ) | |
| c/o Corporate Creations Network, Inc. ) | |
| 11380 Prosperity Farms Road, #221 ) | |
| Palm Beach Gardens, FL 33410 ) | |
|  ) | |
|                    Defendants. ) | |

## COMPLAINT

Plaintiffs, the International Painters and Allied Trades Industry Pension Fund ("Pension

Fund") as and for its Board of Trustees, and Tim Maitland ("Maitland"), in his official capacity

as a fiduciary, by and through their undersigned counsel, bring this Complaint against

Defendants, Hussmann Corporation ("Hussmann") and FCC, LLC, d/b/a First Capital

Corporation ("FCC").

## SUMMARY OF ACTION

This is an action for monetary and equitable relief to recover employer withdrawal liability, interest, costs, and attorneys' fees and other penalties as authorized by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended. The events necessitating this cause of action arise out of Hussmann's 2014 purchase of assets of The Columbus Show Case Company ("CSC"). At the time of Hussmann's purchase, CSC had already been served (in November 2013) with a demand for $1,227,139.00 in withdrawal liability ("Withdrawal Liability") owed to the Pension Fund. On April 15, 2014, Plaintiffs had filed a Complaint for Withdrawal Liability based upon CSC's default of its withdrawal liability payments pursuant to 29 U.S.C. § 1399(c)(5). On November 13, 2014, the U.S. District Court for the District of Maryland entered a final judgment in favor of the Pension Fund against CSC for $1,508,357.86. *Int'l Painters and Allied Trades Indus. Pension Fund v. The Columbus Show Case Company*, Civ. Action No. 14-1277 (D. Md. 2014). Plaintiffs bring this action to collect the unpaid Withdrawal Liability under the common law theory of successor liability and applicable law, and to avoid transfers with a primary purpose to evade or avoid payment of withdrawal liability.

Under common law successor liability, Hussmann should be subject to successor liability if it (1) had notice of CSC's withdrawal liability, (2) CSC was unable to the pay the withdrawal liability, and (3) there was substantial continuity of operations between CSC and Hussmann.

Alternatively, under ERISA Section 4212, the Court should avoid certain transactions described herein because they were structured with a principal purpose to avoid or evade CSC's Withdrawal Liability owed to the Pension Fund. As the recipient of improperly transferred CSC assets, Hussmann should be subject to CSC's Withdrawal Liability.

In support of these claims, Plaintiffs make the following detailed allegations primarily based upon personal knowledge as to their own actions, publicly available information, information obtained through sworn court proceedings and testimony[1], and upon information and belief as to the actions of others.

## JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action without regard to the amount in controversy under 29 U.S.C. § 1451(c).

2.      A copy of this Complaint has been served on the Pension Benefit Guaranty Corporation by certified mail pursuant to 29 U.S.C. § 1451(g).

## VENUE

3.      Venue lies in this district under 29 U.S.C. § 1451(d) because the Plan has offices in  this district.

## PARTIES

4.      Plaintiff, International Painters and Allied Trades Industry Pension Fund, as and for its Board of Trustees and the International Painters and Allied Trades Industry Pension Plan ("Fund" or "Pension Fund"), is a trust fund established under 29 U.S.C. § 186(c)(5). It sues in its common name for its Trustees who collectively are the "named fiduciary," "plan administrator" and "plan sponsor" and each is an individual "fiduciary," within the meaning of 29 U.S.C. §§ 1102(a), 1002(16), (21), for the International Painters and Allied Trades Industry Pension Plan

---

[1] Sworn deposition testimony of Carl Aschinger, Jr., taken under oath and transcribed by a Court reporter in a judgment debtor examination of CSC on April 26, 2016, taken in connection with Ohio proceeding titled Misc. Action No. 2:16-001, at ECF No. 1 (S.D. Ohio 2016).

("Pension Plan").  The Pension Plan is a "multiemployer plan," "employee benefit plan" and

"employee benefit pension plan" within the meaning of 29 U.S.C. § 1002(37), (2), (3) and

1301(a)(3). The Fund, its trustees and Pension Plan maintain their principal place of business and

the Pension Plan is administered from an office at the address for Plaintiffs Fund in the caption

of this Complaint.  The Fund and its trustees are adversely affected by the acts or omissions of

Defendants described in this Complaint.

5.      Plaintiff, Tim D. Maitland, in his official capacity as a fiduciary, ("Maitland" or

jointly with the Pension Fund, "Plaintiffs"), is the Administrator of the Pension Fund and a

fiduciary or a plan participant within the meaning of 29 U.S.C. § 1002(21), § 1451(a), who is

charged with responsibility for collection of withdrawal liability for the Pension Plan by the

Trustees of the Pension Fund and is adversely affected by the acts or omissions of Defendants

described in this Complaint.

6.      The Pension Fund and Maitland, in their capacity as authorized fiduciary(ies) and

agent(s), sue for and on behalf of the Pension Plan.

7.      The Pension Fund receives contributions from employers which operate or do

business within the jurisdiction of International Union of Painters and Allied Trades ("IUPAT")

District Councils or Locals and which participate in the Pension Plan pursuant to collective

bargaining agreements and participation agreements.

8.      The Pension Fund pays pension and retirement benefits to qualified participants in

the Pension Plan. According to Pension Fund records, the Pension Plan provides pension and

retirement benefits to more than 3,500 active and retired IUPAT members and their families

throughout Ohio, including former employees of Columbus Show Case Company.

9.     Defendant, HUSSMANN CORPORATION ("Hussmann" or "Defendant") is a Missouri corporation and is an employer in an industry affecting commerce within the meaning of 29 U.S.C. §§ 152(2), (6) and (7), 1002(5), (11) and (12) with a business office at the address listed in the caption.

10.     Hussmann also has been registered as a foreign corporation to do business in the state of Ohio since 1929.

11.     According to its website, Hussmann is a leader in providing display merchandisers, refrigeration systems, installation and services to food retailers around the world.

12.     Defendant FCC, LLC, d/b/a First Capital Corporation ("FCC") was a duly registered Florida limited liability company. FCC was voluntarily dissolved by its members effective September 20, 2017, based on Articles of Dissolution publicly filed with the Florida Secretary of State. According to a Bloomberg summary, FCC offered "asset-based lending, traditional factoring, and invoice purchasing, as well as provides receivables management and receivables asset monetization programs."[2]

## **BACKGROUND**

### CSC Financial Difficulty and Withdrawal from the Pension Fund

13.     The Columbus Show Case Company d/b/a CSC Worldwide ("CSC") was operated by the Aschinger family of Columbus, Ohio since 1905. CSC was primarily engaged in the manufacture, assembly and non-retail sale of display units primarily used in the food industry. Carl Aschinger Jr. was the Chairman of CSC at all relevant times until his resignation

---

[2] Available at https://www.bloomberg.com/profile/company/0129546D:US (last accessed 10/10/2019).

effective October 9, 2015.

14.     Since 2008, CSC had a subsidiary, CSC Specialty Retail Group, LLC ("SRG"), that produced display units primarily used in the retail industry. In 2015, the NLRB determined that CSC and SRG were a single-integrated business enterprise and a single employer within the meaning of the National Labor Relations Act. *The Columbus Show Case Company*, 362 NLRB No. 90, 767-768 (2015).

15.     CSC was party to collective bargaining agreements with unions from several trades: (a) Sheet Metal Workers International Union, Local Union No. 24; (b) Council of Industrial Workers, United Brotherhood of Carpenters and Joiners of America, Local 2077; (c) International Brotherhood of Electrical Workers Local Union No. 683; (d) IUPAT District Council 6, Local Union No. 1275; and (e) Glaziers, Architectural Metal and Glass Workers Union No. 372.

16.     Under the terms of its collective bargaining agreement with IUPAT District Council 6, CSC was required to make contributions to the Pension Fund and was bound by the trust agreements and governing documents of the Pension Fund and Pension Plan.

17.     In 2012, CSC encountered financial difficulties and was informed by its primary bank, Huntington Bank (a subsidiary of Fifth Third Bancorp), that the bank would no longer continue lending to CSC.

18.     CSC, through its then-CEO Christopher ("Chris") Aschinger (son of Chairman Carl Aschinger Jr.), negotiated with FCC, LCC d/b/a First Capital Corporation ("FCC")[3], as a

---

[3] At all times relevant to the facts herein, FCC was a duly registered Florida limited liability company. FCC was voluntarily dissolved on September 20, 2017.

takeout lender to succeed Huntington Bank.

19.     On December 17, 2012, FCC, CSC, and SRG entered into a Loan Agreement under which CSC and SRG granted FCC a continuing priority security interest in and general lien upon all assets and properties of CSC and SRG. FCC's general security interest is evidenced by UCC financing statements filed on December 4, 2012, with the Ohio Secretary of State that covered all assets of CSC and SRG.

20.     In or around December 2012, once FCC had a security interest in CSC and SRG, FCC became actively involved in the management and operation of CSC. For example, FCC engaged management consultant ATEC and Joseph "Joe" Vierling to run CSC on a day-to-day basis. ATEC Liquidations, Inc., d/b/a ATEC, f/k/a ATEC, Inc., is a duly-registered Missouri for-profit corporation.

21.     Of particular note, Joe Vierling of ATEC previously worked with Hussmann.

22.     In early 2013, Carl Aschinger Jr. returned as CEO to CSC with the specific goal of keeping labor costs down. At the same time Carl Aschinger Jr. became CEO, Chris Aschinger moved to SRG.

23.     FCC was aware of CSC's union obligations and the consequences of potential termination of CSC's collective bargaining agreements. Upon becoming CEO of CSC in 2013, Carl Aschinger Jr.'s chief role was to engage with the unions into lowering labor costs so that CSC could remain viable. He was unsuccessful.

24.     On August 9, 2013, Columbus Show Case notified its employees and union business agents that it would shut down all operations that day at its facility at 4401 Equity Drive in Columbus, Ohio.

25.     Columbus, Ohio-area news outlets reported on the CSC closure. For example, on August 12, 2013, the Columbus Dispatch published an article that indicated that CSC had laid off 94 employees.[4]

26.     Carl Aschinger Jr. continued negotiating with the unions up until the CSC shutdown.

27.     After the shutdown and layoff, CSC ceased most business operations but a few individuals were retained to complete ongoing projects. FCC and ATEC wound down the business with the assistance of Carl Aschinger III (another son of Carl Aschinger Jr.) and John Grega, Vice President and Chief Financial Officer of CSC. Carl Aschinger Jr. remained CEO of CSC until he resigned on October 9, 2015.

28.     On September 5 and 12, 2013, several unions[5] (altogether, "Unions") filed charges with the National Labor Relations Board alleging that The Columbus Show Case Company d/b/a CSC Worldwide and CSC Specialty Retail Group, LLC engaged in unfair labor practices by, namely, repudiating their obligations under their collective bargaining agreements with the Unions. These charges were publicly available on the NLRB's website. On November 19, 2013, the NLRB General Counsel issued a consolidated complaint and notice of hearing and on February 7, 2014, an amended complaint. On May 20, 2015, the Board issued a default judgment.

---

[4] Available at https://www.dispatch.com/article/20130812/news/308129665 (last accessed 7/11/2019).
[5] Sheet Metal Workers International Association, Local Union No. 24, AFL-CIO; Council of Industrial Workers, United Brotherhood of Carpenters and Joiners of America, Local 2077; International Union of Painters and Allied Trades, District Council 6, Local Union No. 1275, AFL-CIO, CLD; the Glaziers, Architectural Metal and Glass Workers, Local Union No. 372; and International Brotherhood of Electrical Workers, Local Union 683, AFL-CIO.

29.     By letter dated November 20, 2013, the Pension Fund notified Columbus Show Case Company and any other trades or businesses under common control with CSC that CSC had withdrawn from the Pension Plan within the meaning of 29 U.S.C. § 1383(a) or 29 U.S.C. § 1385, notification of liability of $1,227,139.00 under 29 U.S.C. §§ 1381, 1399 ("Withdrawal Liability"), and a demand for payment as provided by 29 U.S.C. §§ 1382, 1399(b)(1). CSC failed to make its first scheduled installment.

30.     On January 29, 2014, the Pension Fund notified Columbus Show Case Company and any other trades or businesses under common control with CSC, that it defaulted on its first payment obligation and that the Pension Fund may require immediate payment of the outstanding withdrawal liability with interest if the default was not cured within sixty (60) days.

31.     FCC, as a secured lender actively involved in the management and operation of CSC, was a trade or business under common control with CSC. *See, e.g., Sun Capital Partners III, LLP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129 (1st Cir. 2013), *cert. denied*, 82 U.S.L.W. 3509 (U.S. Mar. 3, 2014); *Teamsters Joint Council No. v. 83 v. Centra, Inc.,* 947 F.2d 115, 121 (4th Cir. 1991) ("Control group members are plainly liable for withdrawal liability of other members.")

32.     Furthermore, the National Labor Relations Act defines an employer to include "any person acting as an agent of an employer, directly or indirectly. . ." 29 U.S.C. § 152(2). Since FCC acted as an agent of CSC, and otherwise, through ATEC exercised complete dominion and control over CSC and its operations and assets, FCC was under common control with CSC for purposes of the Withdrawal Liability.

33.     On April 15, 2014, the Pension Fund filed a Complaint against CSC in the United

States District Court for the District of Maryland. *Int'l Painters and Allied Trades Indus. Pension Fund v. The Columbus Showcase Company*, Civ. Action No. 14-1277, at ECF No. 1 (D. Md. 2014). The Complaint and Summons were served upon CSC on June 2, 2014, by serving Carl Aschinger Jr., President of CSC. CSC did not respond to the Complaint or otherwise appear, and on November 13, 2014, the Court entered default judgment against CSC. On January 12, 2016, the judgment was registered in the United States District Court for the Southern District of Ohio, Misc. Action No. 2:16-001, at ECF No. 1 (S.D. Ohio 2016).

<u>Sale of CSC Assets</u>

34.     On December 9, 2013 (barely three weeks after the Pension Fund's demand for Withdrawal Liability to CSC), CSC, SRG and FCC entered into a Peaceful Possession of Collateral Agreement. Under the agreement, CSC and SRG ("Debtors"), as well as Guarantors Carl Aschinger Jr., Chris Aschinger, and John Grega ("Guarantors"), surrendered certain CSC assets to FCC under the 2012 Loan Agreement. The agreement stated that CSC and SRGwere indebted to FCC for $3,534,238.33 plus interest. The agreement did not account for CSC's withdrawal liability.

35.     Sometime in December 2013, approximately three (3) or four (4) weeks after the Pension Fund's demand for Withdrawal Liability to CSC, FCC sold most of CSC's machinery and equipment at an auction that netted $320,000. FCC also held a scrap sale of inventory. All proceeds from the auction and scrap sale went to FCC.

36.     On January 8, 2014, approximately seven (7) weeks after the Pension Fund's demand for Withdrawal Liability to CSC, CSC, SRG and FCC entered into a second Peaceful Possession of Collateral Agreement (together with the December 9, 2013, agreement, "Surrender

Agreements"). The second agreement stated that CSC and SRG were indebted to FCC for $2,697,211.00 plus interest. Under the agreement, CSC, SRG, and Guarantors surrendered all remaining assets covered by FCC's blanket lien. Again, the agreement did not account for CSC's Withdrawal Liability.

37.     The Surrender Agreements, auction, and scrap sale described herein left CSC with no ability to pay the Withdrawal Liability owed the Pension Fund.

38.     FCC and ATEC, through Joe Vierling, attempted to sell the remainder of CSC, specifically its food division, to several different buyers, including Hussmann. As noted herein, Joe Vierling previously worked with Hussmann.

39.     Hussmann was and is a dominant player in the refrigerated case industry and was a competitor to CSC for at least 85 years.

40.     A Hussmann representative(s) met with Vierling at the CSC Columbus facility at least twice: (i) while the facility was still operating, i.e. before the workforce layoff, and (ii) during the winding down period.

41.     Hussmann and its representatives knew CSC was a unionized company.

42.     On or about April 9, 2014, approximately ten (10) weeks after the Pension Fund sent a Notice of Default to CSC regarding its Withdrawal Liability demand, Hussmann entered into a Non-Competition Agreement ("Non-Compete") with CSC and CSC's shareholders, Carl Aschinger Jr., Cathleen Aschinger Pugh, Christopher Aschinger, and Carl (Chip) Aschinger III, all of whom were signatories to the Non-Compete. The Non-Compete intended "that Buyer be protected from direct or indirect competition with respect to the Assets for a reasonable period of time."

43.     On May 8, 2014, approximately three (3) weeks after the Pension Fund filed a

Withdrawal Liability complaint against CSC, Hussmann entered into a purchase agreement with

FCC ("Purchase Agreement") to purchase CSC's intellectual property for $500,000 plus

royalties not to exceed $2.5 Million.

44.     The Purchase Agreement included the following closing conditions:

(c)     "The results of Buyer's due diligence investigation of CSC's business
shall be satisfactory to Buyer.

*       *       *

(h)     Buyer shall have received a fully executed copy of the Non-Competition
Agreement.

(i)     Firm commitments from Cathleen Aschinger Pugh, Mark Pugh, and Art
Short to be employed by Buyer pursuant to offer letters sent by Buyer as of the Closing
Date as evidenced by a fully executed Hussmann standard non-compete agreement and
each one's continued employment by Buyer.

(j)     An Affidavit by CSC in a form reasonably acceptable by Buyer that
Cathleen Aschinger Pugh, Mark Pugh and Art Short have been released from
employment by CSC and that any employment by Buyer shall not be a breach of contract
or be contrary to any rights of CSC.

45.     The Purchase Agreement was dependent upon the Surrender Agreements and

explicitly excluded Hussmann's assumption of any liabilities of CSC. CSC was fully aware of

this transaction at all times relevant and cooperated with and fulfilled all conditions precedent

attendant to the Purchase Agreement.

46.     Also in May 2014, FCC and Hussmann entered into a Secured Party Bill of Sale

("Bill of Sale") under which FCC caused certain assets of CSC to be delivered to Hussmann,

including product designs related to specific products, brands, and intellectual property of CSC's

food industry line. The product designs transferred included: designs, plans and specifications for

all the products; drawings for all products, computer renderings; manufacturing procedures for each product; and bills of materials for all products. FCC signed the Bill of Sale as "FCC, LLC, d/b/a FIRST CAPITAL as Secured Party in Possession."

47.     Hussmann intended to utilize CSC's food industry product designs to enhance its own already existing specialty products line.

48.     On June 9, 2014, seven (7) days after the Pension Fund served Carl Aschinger, Jr., CEO of CSC, with the complaint and summons of its Withdrawal Liability lawsuit, Hussmann entered into a Domain Name and Website Purchase Agreement ("Domain Purchase") with FCC, as secured party in possession of the assets of CSC, and Chris Aschinger. Under the Website Purchase Agreement, FCC, as secured party in possession of the assets of CSC, and Chris Aschinger sold the internet domains "cscww.com/", "cscworldwide.com/", and "columbusshowcase.com/" (altogether "Domains"), all rights and benefits affiliated with those domains, and all other intellectual property rights associated with those domains, for $1 to Hussmann.

49.     For a time, those Domains redirected web browsers to the Hussmann corporation website, which proclaimed:

> Did you know?  Hussmann acquired the intellectual property in the form of designs and bills of materials of the former Columbus Show Case Company. This transaction means that we can provide our customers with Columbus Show Case fixtures and equipment as well as parts and service for those cases. Hussmann welcomes the opportunity to speak with you about your refrigerated case needs.[6]

---

[6] Redirect from "www.columbusshowcase.com" to http://www.hussmann.com/en/Pages/CSC.aspx, now available through the Wayback Machine (last accessed July 27, 2019).

50.     The Purchase Agreement, Non-Compete, Bill of Sale and Domain Purchase are referred to hereafter as the "Asset Sale" of CSC assets to Hussmann.

51.     The key events described herein occurred in a short, well-orchestrated chronological order. Attached as Exhibit 1 is an illustrative timeline of those key events.

52.     All conditions precedent to this action have been satisfied.

## COUNT I – SUCCESSOR LIABILITY UNDER FEDERAL COMMON LAW

53.     Plaintiffs incorporate Paragraphs 1 through 52 by reference.

54.     On or about April 2014, Hussmann purchased CSC's intellectual property, website domains, products, for approximately $500,000 in cash and additional royalties not to exceed $2.5 Million.

55.     Although Hussmann's Purchase Agreement was consummated primarily with FCC, FCC was acting in its capacity as a secured party in possession of CSC's assets. CSC's shareholders were necessary parties to effect the Asset Sale and were otherwise fully aware of and participated in the sale.

56.     Hussmann should be subject to the Withdrawal Liability if (i) it had notice of the Withdrawal Liability, (ii) CSC was unable to pay the Withdrawal Liability, and (iii) there was substantial continuity of operations between CSC and Hussmann.

### Notice of Withdrawal Liability

57.     FCC, ATEC, and Hussmann were aware of CSC's union obligations and the consequences of potential termination of CSC's collective bargaining agreements.

58.     Hussmann was aware that CSC was a unionized company.

59.     During the time CSC was operated by ATEC and Joe Vierling, CSC paid

employees wages proscribed by various collective bargaining agreements under the CSC operating budget (which was approved by ATEC and FCC).

60.     One of the reasons that FCC and ATEC stopped operating CSC was due to CSC's high labor costs.

61.     Hussmann employed several former CSC managers and key employees. At all times, Hussmann's employees' (including the former CSC employees) actual and constructive knowledge of CSC's liability should be imputed to Hussmann.

62.     Hussmann engaged competent counsel to negotiate its purchase of CSC's assets. Counsel's due diligence would have, or should have, revealed at the time of the Asset Sale, litigation had been commenced against CSC by: (i) the Pension Fund, (ii) the Sheet Metal Workers National Pension Fund[7], and that there was (iii) ongoing NLRB litigation.[8] Furthermore, as noted herein, a condition of closing was that the "results of Buyer's due diligence investigation of CSC's business shall be satisfactory to Buyer."

63.     On May 8, 2014, Hussmann signed a purchase agreement for certain intellectual property assets of CSC.

64.     Based on the forgoing facts, at the time of the asset sale, Hussmann knew or should have known that CSC owed Withdrawal Liability to the Pension Fund.

### CSC's Inability to Pay Withdrawal Liability

65.     CSC was in financial peril and all of its assets were subject to a blanket lien by

---

[7] *Bd. of Trs., Sheet Metal Workers Nat'l Pension Fund v. The Columbus Show Case Co*., No. 1:14-cv-0478 (E.D.Va.)
[8] NLRB consolidated complaints 09-CA-112725; 09-CA-112731; 09-CA-113317; 09-CA-113319; 09-CA-113323.

FCC.

66.     The actions of CSC, FCC, and Hussmann adversely affected the Pension Fund's ability to collect the Withdrawal Liability.

67.     At the time of the Asset Sale, Hussmann knew that CSC had terminated operations and that FCC was acting as a secured creditor in possession of CSC assets to sell off those assets.

68.     At the time of the Asset Sale, Hussmann knew that CSC was unable to pay its Withdrawal Liability to the Pension Fund.

### Substantial Continuity

69.     Until the Asset Sale, CSC owned the rights to its designs, a customer list, list of vendors, and Domains.

70.     Hussmann was a competitor to CSC and one of the biggest players in the refrigerated case industry. It already possessed the means to produce the CSC products for which it purchased designs, including machinery and equipment, a facility to house the production line, and an existing workforce of its own.

71.     As previously noted, CSC had been in business for over 100 years and had an extensive customer base.

72.     By purchasing CSC's intellectual property, customer lists, vendor lists, and Domains, Hussmann grew its customer base to include all or significant part of CSC's customers.

73.     By purchasing CSC's intellectual property, Hussmann could continue to produce CSC products with Hussmann's existing means of production.

74.     Since the Asset Sale, Hussmann acquired and operated all or a significant part of CSC's internet domain names, including ColumbusShowCase.com, CSCWW.com, and CSCworldwide.com.

75.     Since the Asset Sale, Hussmann caused CSC's Domains to redirect to Hussmann. Through the redirected internet traffic, Hussmann advertised its purchase of CSC's patents to attempt to ensure previous CSC customers would seek out Hussmann for new or ongoing business.

76.     There is substantial continuity of the application of CSC's intellectual property and utilization of CSC's proprietary customer lists and vendor lists.

77.     At the time of the Asset Sale, Mark Pugh was the Vice President of Sales for CSC.  After the Asset Sale, Mr. Pugh was hired by Hussmann as Outsource Product Manager and was subject to Hussmann's non-compete. Mr. Pugh is the spouse of Cathleen Aschinger Pugh.

78.     At the time of the Asset Sale, Cathleen Aschinger Pugh was Vice President of Food Service Sales for CSC. Ms. Pugh is the daughter of Carl Aschinger Jr. and spouse of Mark Pugh. After the Asset Sale, Ms. Pugh was hired by Hussmann and also was subject to Hussmann's Non-Compete.

79.     At the time of the Asset Sale, Arthur ("Art") Short was a CSC Engineer. After the Asset Sale, Art Short was hired by Hussmann as Product Sales Specialist and was subject to Hussmann's Non-Compete. Based upon publicly available information, Mr. Short's job at Hussmann was specialized in the development and manufacturing of special display equipment for the supermarket, C-store and food service industry. This is the same business previously

engaged in by CSC. Mr. Short worked in various capacities for CSC since approximately 1970, designed several CSC products, and had access to continuous contact with CSC customers and suppliers.

80.     As a condition of closing on the Purchase Agreement with FCC, Hussmann required that Art Short, Cathleen Aschinger Pugh, and Mark Pugh all commence employment with Hussmann. Hussmann's employment of three key CSC employees and managers enabled Hussmann to continue to market and sell CSC products.

81.     There was substantial continuity between CSC and Hussmann regarding management and key employees.

82.     As a matter of law, including federal common law as developed under ERISA, Hussmann is the successor to CSC, and it is jointly and severally liable for the outstanding Withdrawal Liability amounts due and owing to the Pension Fund following CSC's complete withdrawal from same, together with interest, costs, attorneys' fees, and any penalties related thereto.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter the following relief:

(a)     Judgment declaring that Hussmann is a successor to Columbus Show Case and under federal common law and is therefore liable to the Pension Fund for CSC's unpaid withdrawal liability;

(b)     Judgment in favor of the Plaintiffs, for the benefit of the Pension Plan, against Hussmann, in the amount of $1,227,139, plus interest calculated in accordance with 26 U.S.C. § 6621 from the date CSC defaulted on its payments to the date of judgment;

(c)     Award the Pension Fund post-judgment interest under 28 U.S.C. § 1961;

and

(d)     Judgment in favor of the Plaintiffs, for the benefit of the Pension Plan, against Hussmann, for the attorneys' fees and costs incurred by Plaintiffs pursuant to 29 U.S.C. §§ 1401(d), 1145, 1132(g)(2);

(e)     Grant the Pension Fund such other legal and equitable relief as shall be just and proper.

## COUNT II – EVADE OR AVOID LIABILITY

83.     Plaintiffs incorporate Paragraphs 1 through 82 by reference.

84.     FCC, together with the participation of CSC, clearly structured the sale of assets to Hussmann to ensure full payment to FCC while leaving the principal other debts of CSC behind.

85.     The withdrawal liability owed to the Pension Fund was the principal other debt of CSC in April and May 2014.

86.     ERISA Section 4212 [29 U.S.C. § 1392(c)] prohibits a transaction if a principal purpose of that transaction is to evade or avoid withdrawal liability.

87.     If a pension fund is "adversely affected by the acts of any party who has attempted to 'evade or avoid liability' under the MPPAA… then the MPPAA shall be applied 'without regard to such transaction.' To calculate *and* collect liability, 'without regard to such transaction,' any assets that were transferred in order to 'evade or avoid liability,' as well as the parties to whom they were improperly transferred, must be within the reach of the statute.'" *Cent. States Se. & Sw. Areas Pension Fund v. Cargo Carriers, Inc.,* No. 1:11-cv-461, 2013 BL 193477 *8, *quoting IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049 (2d Cir. 1993).

88.    According to the second Peaceful Possession Agreement, the balance of CSC's debt to FCC as of January 8, 2014, was $2,697,211.00 plus interest accrued. Under the Asset Sale, Hussmann paid FCC $500,000 plus royalties not to exceed $2.5 Million, or $3 Million total. The amount of the royalties paid under the Purchase Agreement is unknown as of the date of this Complaint.

89.    The transactions between CSC, FCC, and Hussmann rendered CSC insolvent for the purpose of evading or avoiding the Withdrawal Liability.

90.    The transactions between FCC, CSC and its owners and family members and Hussmann allowed for payment to FCC without consideration of the Withdrawal Liability. Taken together, the transactions evaded or avoided the payment of the Withdrawal Liability, which was the principal other debt of CSC in April and May 2014.

91.    To collect withdrawal liability under ERISA Section 4212 "without regard to such transaction," any assets that were transferred in order to evade or avoid liability, as well as the parties to whom they were improperly transferred, are recoverable by the pension plan that has been adversely affected.

92.    Under ERISA Section 4212, any purported limitations of the liability in the Surrender Agreements and Asset Sale may be disregarded and Hussmann may be held liable to the Pension Fund for the full amount of CSC's withdrawal liability.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter the following relief:

(a)    Enter judgment declaring that the Surrender Agreements and Asset Sale are disregarded under ERISA Section 4212;

(b)    Award equitable relief, including but not limited to, imposition of a

constructive trust in favor of the Pension Fund on all assets wrongfully transferred to Hussmann under the Surrender Agreements and Asset Sale, up to the amount of the Withdrawal Liability ($1,227,139.00), plus all interest that has accrued, for the benefit of the Pension Fund;

(c)     Judgment in favor of the Plaintiffs, for the benefit of the Pension Plan, against Hussmann, for all withdrawal liability, interest on withdrawal liability from the date the payments were due;

(d)     Judgment in favor of the Plaintiffs, for the benefit of the Pension Plan, against Hussmann, for the attorneys' fees and costs incurred by Plaintiffs pursuant to 29 U.S.C. §§ 1401(d), 1145, 1132(g)(2);

(e)     Award the Pension Fund post-judgment interest under 28 U.S.C. § 1961; and

*(space intentionally left blank)*

8

(f)     Grant the Pension Fund such other legal and equitable relief as shall be

just and proper.

Respectfully submitted,

Date: __10/18/19__

James E. Goodley
Maureen W. Marra*
JENNINGS SIGMOND, P.C.
1835 Market Street, Suite 2800
Philadelphia, PA 19066
(215) 351-0674
jgoodley@jslex.com
dmd_erisa@jslex.com

Craig E. Zucker*
David Eisenberg*
MADDIN, HAUSER,
ROTH & HELLER, P.C.
28400 Northwestern Highway
Suite 200-Essex Centre
Southfield, MI 48034
(248) 354-4030
czucker@maddinhauser.com
deisenberg@maddinhauser.com

* Pro hac vice motions will be filed at the appropriate time.